[File No. 6557.]

SARAH (MRS. MELVIN) TWETEN, Respondent, v. NORTH DAKOTA WORKMEN'S COMPENSATION BUREAU, a Branch of the Executive Branch of Said State of North Dakota, Appellant.

(287 N. W. 304.)

Opinion filed May 26, 1939. Rehearing denied August 9, 1939.

*Alvin C. Strutz,* Attorney General, and *Milton K. Higgins* and *A. M. Kuhfeld,* Assistant Attornéys General, for appellant.

*F. B. Lambert* and *Sinkler & Brekke,* for respondent.

CHRISTIANSON, J. ˙This is an appeal from a judgment in a proceed-

ing under the Workmen's Compensation Act. The proceeding was instituted by Sarah (Mrs. Melvin) Tweten, the surviving widow of Melvin Tweten, as plaintiff, to recover compensation pursuant to the provisions of the Workmen's Compensation Act of this state. Session Laws 1919, chap. 162, as amended.

Plaintiff's husband (Melvin Tweten) died on May 26th, 1935, from lobar pneumonia. At the time of his death he was in the employ of Wells county. The plaintiff duly presented a claim to the Workmen's Compensation Bureau alleging that her said husband had contracted said disease in the course of his employment, on or about May 17th, 1935. The claim was rejected by the Workmen's Compensation Bureau on the ground that "the alleged disability was due to disease not proximately caused by the deceased's employment." Plaintiff thereupon duly appealed to the district court from the decision of the Bureau. Upon the hearing in the district court, both the plaintiff and the Workmen's Compensation Bureau introduced evidence of several witnesses. The district court rendered judgment in favor of the plaintiff, and the Workmen's Compensation Bureau has appealed to this court, and demanded a trial anew.

The deceased, Melvin Tweten, was a World War veteran, and had received injuries from gas during his service in the war. He was employed on a work relief project in Wells county from on or about May 2d, 1935, until he ceased work on May 17th, 1935. His work consisted of making repairs in buildings on the Fair Grounds—in repairing and constructing fences, and planting trees. The evidence shows that the weather was cold and damp, with considerable rain. From the 1st to the 17th of May the temperature ranged from twenty-nine degrees to sixty-five degrees, with a variation in temperature of as much as twenty-seven degrees in a day. There were eighteen cloudy days during the month of May—eleven days partly cloudy and only two clear days. The rainfall in that vicinity during the month aggregated some 2.44 inches. The evidence discloses that on at least one day between May 7th and May 9th, Tweten, in performing his work, was required to crawl under a certain bowery which was being raised; that the ground was cold, wet and icy; that on May 11th, in repairing a fence, he was required to remain for a considerable period of time in a cold drizzling rain, as a result of which he became "soaked;" that

between May 11th and May 17th he was engaged in planting trees, and that in planting them he would kneel on the ground and utilize his hands in setting and packing the wet dirt around the trees. A few days before May 17th, Tweten developed a cold and his wife took him to one Dr. McKeague for treatment. On the morning of May 17th Tweten complained that he was not feeling well, but nevertheless he went to work. One of his fellow workers testified that on the morning of May 17th, about 10 o'clock, he saw Tweten sit down upon a stone and attempt to roll a cigarette, and that sometime thereafter Tweten was discovered lying prostrate upon the cold, wet ground. His wife, who was apprehensive about his condition, came and found Tweten in this condition and took him home; Dr. McKeague was called and found Tweten with a high fever, but did not diagnose his ailment as pneumonia until the following day, namely, May 18th. Tweten died from lobar pneumonia on May 26th.

It is the contention of the appellant that the evidence fails to establish that the disease from which Tweten died was proximately caused by his employment.

The Workmen's Compensation Act provides: " 'Injury' means only an injury arising in the course of employment, including an injury caused by the wilful act of a third person directed against an employee because of his employment, but shall not include injuries caused by the employee's wilful intention to injure himself or to injure another, or by his voluntary intoxication. The term 'injury' includes in addition to any injury by accident, any disease approximately caused by the employment. If the employer claims an exemption or forfeiture under this section, the burden of proof shall be upon him." Laws 1935, chap. 286, § 1. Upon the trial in the district court the plaintiff called, among other witnesses, one Dr. McKeague, the physician who attended Melvin Tweten in his last illness, and who, also, had treated him shortly before he became ill with pneumonia. Dr. McKeague testified that in his opinion the exposure to which Melvin Tweten had been subjected in the course of his employment contributed "more to his pneumonia than anything else." According to his testimony, the disease from which Melvin Tweten died was proximately caused by the employment. The Workmen's Compensation Bureau called two doctors who expressed it as their views that the disease was not proximately caused

by the employment. These doctors, however, did testify that exposure to cold and inclement weather frequently was a contributing cause of pneumonia. The trial court concluded that Tweten's fatal illness was contracted by, and resulted from, the exposure to which he had been subjected during his employment. In other words, the trial court was of the view that the preponderance of the evidence established that plaintiff's death resulted from a disease caused by the employment.

There is uncertainty and conflict among the medical experts as to the period of incubation of lobar pneumonia. They seem agreed, however, that exposure to cold and wet weather frequently is an active agent in bringing on pneumonia, and that persons suffering with cold or flu, or persons whose resistance is otherwise lowered, are more prone to contract pneumonia under circumstances of exposure than persons who are strong and robust. In the very nature of things there might in many cases be considerable difficulty in proving that a person contracted a disease, such as pneumonia, in the course of his employment and that the disease was "approximately caused by the employment." It is clear that ordinarily it would be more difficult to prove that a certain disease was proximately caused by the employment than to prove that a physical injury, such as a broken arm or leg, was sustained in the course of the employment. The latter may ordinarily be established by direct proof; but generally, if not always, the fact that a certain disease was proximately caused by the employment would have to be established by circumstantial evidence. However, the fact that proof may be difficult is no reason for denying relief where an injury has been sustained as a result of disease proximately caused by the employment, where that fact is established by evidence of sufficient probative force; and the reports of adjudicated cases show that, in many instances, recovery has been awarded under Workmen's Compensation Acts for disease (including pneumonia) "approximately caused by the employment." Ann. Cas. 1918B, note p. 328; note in 20 A.L.R. p. 66. Yellow Cab Co. v. Industrial Commission, 210 Wis. 460, 246 N. W. 689.

The plaintiff has made cross assignments of error and asks that this court review the allowances made by the trial court for attorneys' fees and the compensation of Dr. McKeague, an expert witness. The trial court made an allowance of $225 for attorneys' fees for plaintiff's at-

torney and $35 for expenses; and made an allowance of $10 to Dr. McKeague, in addition to the regular witness fee and mileage. It is contended by plaintiff's counsel that these allowances are inadequate and should be increased. We have given the matter careful consideration and have reached the conclusion that we cannot interfere with the allowances made by the trial court.

The statute (Laws 1919, chap. 162, § 17, as amended by Laws 1935, chap. 286) provides that when the district court on an appeal from a decision of the Workmen's Compensation Bureau renders judgment in favor of the claimant:

"The cost of such proceedings, including a reasonable attorney's fee to the claimant's attorney to be fixed by the trial judge, shall be taxed against the Bureau, which fee shall cover and constitute the entire remuneration for the claimant's attorney for all services in connection with such appeal, it being the intention to relieve the claimant of all expense for attorney fees.

"Either party shall have the right to prosecute error as in the ordinary civil cases, and appeals to the Supreme Court in such cases shall be triable de novo."

It will be noted that the statute vests the trial court with power to "fix" the amount of a "reasonable attorney's fee." What is a reasonable attorney's fee in any given proceeding is a matter primarily for the trial court to determine. That determination involves a consideration of facts peculiarly within the knowledge of the trial court. The question is one on which there may be differences of opinion. Obviously the statute vests in the trial court discretionary powers, and the decision of the trial court will not be disturbed on appeal unless it is clearly wrong. Upon the record here we cannot say that the allowances made by the trial court for attorneys' fees and expenses are inadequate or that any valid reason exists for interference by this court with the determination of the trial court.

So far as the assignment predicated upon the allowance of compensation to Dr. McKeague as an expert witness is concerned, we likewise find no reason for interference. Our laws make no provision for payment of a fee to an expert witness other than, or in addition to, the fees allowed to a witness generally. Dr. McKeague treated the deceased. He testified to facts that had come to his attention and knowl-

edge as such attending physician. The views which he gave as an expert were incidental and supplementary to his testimony as to facts that had come to his attention in the particular case. Whether a trial court, in a proceeding under the Workmen's Compensation Act, may or may not make an allowance to a witness in addition to the witness fees allowed to witnesses generally we need not determine here. Assuming without deciding that the trial court may make such allowance, we find no ground under the facts here for holding that the court erred in making too small an allowance to Dr. McKeague. As the defendants make no complaint of the allowance that was made, we do not consider whether the allowance should not have been made.

The judgment appealed from is affirmed.

Nuessle, Ch. J., and Morris and Burr, JJ., concur.

Burke, J., did not participate.

Per Curiam (on petition for rehearing). Defendant has petitioned for a rehearing. The petition is in reality a re-argument. It is said that appellant feels that certain important facts have been overlooked or have not been given due effect. Specific attention is called to this statement in the opinion: "There were eighteen cloudy days during the month of May—eleven days partly cloudy and only two clear days." It is said that in making this statement the court must have overlooked the records of the Weather Bureau which were introduced in evidence. These records were not overlooked. The statement quoted above was based upon these records. We have again examined the records of the Weather Bureau as introduced in evidence and set out on page 153 of the transcript of the proceedings had in the district court, and that is precisely what these records show. The records further show that there was some precipitation on nine of the first seventeen days in May, namely, on May 1st, 2nd, 3rd, 6th, 8th, 9th, 11th, 12th, and the 13th.

It is next contended that the testimony of Dr. McKeague to the effect that the pneumonia which caused Tweten's death was caused by exposure in the course of his employment was predicated upon the theory that Tweten, on May 17th, lay on the wet ground from 10 or 11 o'clock in the morning until about 5 o'clock in the afternoon, and that

the decision of the trial court was predicated upon the same theory; and it is contended that the evidence shows that Tweten lay upon the ground only a relatively short time, namely, about twenty or thirty minutes.

The contention of the defendant that Tweten lay on the ground only some twenty or thirty minutes is predicated upon the testimony of one Kramer who worked with Tweten on the project on May 17th. He testified:

"A. That morning he complained he was not feeling well, and I told him that morning to stay home, but he went along and we were going to fix up this fence, him and me, where the pig pen used to be. It was kind of a raw day. He complained a couple times during the morning that he was not feeling well, and I told him, why don't you quit and go up to the office building, they have a stove and fire in there, and keep warm until we go home tonight. He said it is 10 o'clock and I am going to stick it out to noon. We were just about through at this particular place, and he sat down on a rock and started to roll a cigarette, and I walked up about twenty rods the fence and started working there, and finally his wife and brother-in-law came along, and they asked me where Melvin was, and I said, he is down in the field down there, and in the meantime I turned around and looked and he was laying on the ground, and they went down and picked him up.

"Q. How long had he been laying on the ground, if you know?

"A. I judge around twenty or thirty minutes.

"Q. What can you say as to the ground being wet or dry?

"A. It was wet.

"Q. Had it rained that day?

"A. Not that day but the ground was soaked from before.

"Q. What can you say as to the weather being cold?

"A. It was a raw day.

"Q. And they picked him up?

"A. Yes."

Later, on cross-examination, Kramer testified that it must have been past 10 o'clock when he had the talk with Tweten; that he did not have a watch but that he believed it was closer to 11 o'clock.

There was introduced in evidence upon the trial a transcript of certain testimony taken on the hearing before the Workmen's Compen-

sation Bureau. Such transcript contains testimony given by the plaintiff, Sarah Tweten. She testified, in part, as follows:

"Q. What did he (Melvin Tweten) tell you when he came home that evening on the 17th?

"A. He didn't come home. I had to go and pick him up right there, laying right on the Fair Ground, and there were lots of men there.

"Q. What time of day was this?

"A. I went and got him?

"Q. Yes.

"A. Right before dinner. And he was so weak and sick. I took his fever when we got home, and he had 104 fever.

. . . . . . . . . . . . . .

"Q. Where did you find him when you got there?

"A. They were fixing a fence for a farmer close to the Fair Ground —I don't know the name of the place, but I could show it to you if I could get there.

"Q. Was he lying on the ground?

"A. Yes, he was, and it was damp and rainy, too, that day, and he was so cold."

It is apparent that the length of time Tweten lay upon the ground on May 17th before his wife came and found him cannot be fixed definitely. The trial court in a memorandum decision stated that Tweten lay on the ground from about 10 o'clock in the forenoon for about two hours, until Mrs. Tweten came and took him home.

Dr. McKeague and the trial court were fully aware of defendant's contention. They could not possibly have overlooked it. On the trial of the action, during cross-examination of Dr. McKeague, defendant's counsel specifically, and with considerable elaboration, called the attention of the doctor to the testimony that had been given by Kramer. The record further discloses that Dr. McKeague was present and heard the testimony of the several witnesses who testified upon the trial. The record on this appeal contains the briefs that were submitted to the trial court, and it appears that defendant's counsel, in his brief in the trial court, laid great stress upon the testimony tending to show that Tweten lay upon the ground only some twenty or thirty minutes. In our view, it is not of controlling importance how long the deceased lay upon the ground at that time. The evidence shows that the char-

acter of Tweten's employment and much of the work assigned to him, were such as to expose him to a greater danger of contracting pneumonia than people generally in the community were subjected to. In performing his work he was subjected to a great deal of exposure to cold and wet weather; on May 11th he was thoroughly "soaked" by rain which fell while he was working. The records of the Weather Bureau show that on that day the direction of the wind was from the northeast, and that the minimum temperature was 37° and the maximum temperature was 56°. The evidence further shows that some time prior to May 17th, about May 15th, Tweten had contracted a cold for which he received medical treatment and that this condition continued to exist on May 17th, and that on that day he lay upon the cold and damp ground for some time. According to Dr. McKeague's testimony, pneumonia did not develop until the day following, and it is clear to us that it was his opinion, based not only upon the testimony which he heard, but upon his diagnosis of Tweten's ailment and his treatment of him, that the disease from which Tweten died was contracted during the course of his employment and was proximately caused by his employment. This was also the view of the trial court, and the reading of the record in the case leads us to the same conclusion. In our opinion, the conclusion reasonably to be drawn from the evidence in this case is that Tweten contracted the disease from which he died during the course of his employment, and that the exposure to which he was subjected in the course of such employment resulted in the disease from which he died. In other words, the evidence, as we view it, shows that the disease from which Tweten died was proximately caused by his employment.

It is next contended that the disease from which Tweten died is not a compensable "injury" within the meaning of the Compensation Act. It is asserted that in order to constitute a compensable injury pneumonia must arise from, and be proximately caused by, some wound or injury sustained in the course of the employment. In support of this contention defendant calls attention to the decision of the Court of Civil Appeals of Texas in Amann v. Republic Underwriters, 100 S. W. (2d) 778, and it is said that "the construction placed on the Texas statute is identical with the construction which should be placed on the North Dakota statute."

In the Texas case, the claimant, Amann, in the course of his employment as a truck driver for a transportation company was exposed to rain and chilling winds because of the lack of glass in the windows of the cab. He contracted a severe cold. Congestion of his throat, chest, and lungs developed, associated with an elevated temperature and the coughing up of blood. He claimed that as a result of his illness he tired easily and that he was unable to work more than a few minutes at a time; that his heart had been affected, causing him pain and suffering at intervals; that his lungs had been affected, and that he had lost weight and was debilitated. The Industrial Accident Board denied him compensation under the Workmen's Compensation Act of Texas, and he brought suit to set aside the Board's decision. The trial court denied relief, and the applicant appealed to the court of civil appeals. That court sustained the decision of the lower court. It is that decision which is invoked by defendant's counsel in this case.

The differences between the statute construed by the court of civil appeals of Texas and the statute involved here are such as to render the decision of the Texas court of little or no aid in this case. The statute involved in Amann v. Republic Underwriters, supra, defines an injury as "damage or harm to the physical structure of the body and such diseases or infection as naturally result therefrom." 100 S. W. (2d) p. 780. The Workmen's Compensation Act of this state originally defined injury thus: " 'Injury' means only an injury arising in the course of employment, including an injury caused by the wilful act of a third person directed against an employee because of his employment, but shall not include injuries caused by the employee's wilful intention to injure himself or to injure another." Laws 1919, chap. 162, § 2. In 1925, the legislature amended the Act and extended the meaning of the word "injury" by providing: "The term 'injury' includes in addition to an injury by accident, any disease proximately caused by the employment." Laws 1925, chap. 222, § 2.

Prior to the enactment of chapter 222, Laws 1925, this court had ruled that a physical impact was not a necessary prerequisite to an "injury" within the North Dakota Workmen's Compensation Act, and that prostration from artificial heat, in the course of employment, resulting in illness and subsequent death constituted a compensable injury within the meaning of the statute. Pace v. North Dakota Work-

men's Compensation Bureau, 51 N. D. 815, 201 N. W. 348. The obvious purpose of chapter 222, Laws 1925, was to enlarge the meaning of the term "injury" and include within the meaning of that term "any disease proximately caused by the employment;" for the Amendment was adopted in light of the decision of this court in Pace v. North Dakota Workmen's Compensation Bureau, which was rendered in November, 1924. To give to the statute the construction contended for by the defendant, and to hold that in order to be compensable a disease must arise from, and be directly traceable to, some physical impact and hurt, would nullify the Amendment of 1925. The language employed by the legislature in the Amendment of 1925 is clear and specific. It says: "The term 'injury' includes . . . any disease proximately caused by the employment."

The Workmen's Compensation Act does not provide for general health insurance or for general accident insurance. It covers neither accidents sustained nor diseases contracted by an employee outside of his employment. But, it does provide that an injury arising in the course of employment and resulting in disability shall be compensable, and that "any disease proximately caused by the employment" shall constitute a compensable injury.

Different rules prevail in different states as regards whether and when a disease is a compensable injury. The apparent conflict in the authorities is generally found to stem from differences in the statutes. The North Dakota Workmen's Compensation Act is broader in its coverage than the laws of many states. The term "injury" within the purview of that Act is quite comprehensive. Even under statutes where the term "injury" has a more restricted meaning, a disease of the character of the one involved here has been held to be a compensable injury. In McPhee's Case, 222 Mass. 1, 109 N. E. 633, 10 N. C. C. A. 257, the Supreme Judicial Court of Massachusetts held that an employee who became drenched with water and inhaled damp smoke when assisting in extinguishing a fire which endangered property in his care, and as a result contracted lobar pneumonia, had sustained "a personal injury" within the meaning of the Workmen's Compensation Act of Massachusetts. See also Hurle's Case, 217 Mass. 223, 104 N. E. 336, L.R.A.1916A, 279, Ann. Cas. 1915C, 919, 4 N. C. C. A. 527; Johnson's Case, 217 Mass. 388, 104 N. E. 735, 4 N. C. C. A. 843.

The supreme court of California has held that influenza contracted, in the course of employment, because of exceptional exposure due to close contact with other employees who were afflicted with the disease, is a compensable injury under a statute which provides that: "The term 'injury,' as used in this act, shall include any injury or disease arising out of the employment." San Francisco v. Industrial Acci. Commission, 183 Cal. 273, 191 P. 26; Engels Copper Min. Co. v. Industrial Acci. Commission, 183 Cal. 714, 192 P. 845, 11 A.L.R. 785.

Defendant calls attention to the following provision in chapter 312, Laws 1931: "In case of aggravation of any disease existing prior to a compensable injury, compensation shall be allowed only for such proportion of the disability due to the aggravation of such prior disease as may reasonably be attributable to the injury." And, it is contended that inasmuch as the evidence discloses that the deceased, Tweten, had received injuries from gas during his service in the World War that the court must determine what proportion of the compensable injury was due to the prior condition and what proportion was due to the aggravation attributable to the injury Tweten sustained in the course of his employment. In our opinion, this contention is not well founded. The above quoted statutory provision applies only to the aggravation of an existing disease; it does not require or permit a structural weakness to be considered in the allowance of compensation. Where an employee is afflicted with a disease, and in the course of his employment becomes disabled due to an aggravation of such prior disease, compensation is allowable only for the "proportion of the disability due to the aggravation of such prior disease as may be reasonably attributable to the injury" that has been sustained during the course of the employment. The North Dakota Workmen's Compensation Act does not proceed upon the theory that every employee, on entering into an employment, is in perfect health and free from structural weakness. Compensation is not made to depend upon the condition of health of the employee or upon his freedom from liability, to injury through a constitutional weakness or latent tendency; compensation is awarded for an injury which is a hazard of the employment. If the injury is the proximate cause of the death or disability for which compensation is sought, the physical condition of the employee at and prior to the time of the injury is important only if the injury for which compen-

sation is sought was occasioned by a disease that existed prior to the injury for which compensation is sought. In such case compensation is allowable only "for such proportion of the disability due to the aggravation of such prior disease as may reasonably be attributable to the injury." In this case, the disease which caused Tweten's death did not exist prior to the compensable injury. The "injury" which produced Tweten's death was lobar pneumonia, which arose in the course of, and was "proximately caused by, the employment."

Rehearing denied.

NUESSLE, Ch. J., and CHRISTIANSON, BURR, and MORRIS, JJ., concur.